UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
----------------------------------------------------
In re
                THE COLAD GROUP, INC.                        05-10765 B


                        Debtor
----------------------------------------------------
                        Harter, Secrest & Emery LLP
                        Raymond L. Fink, Esq., of counsel
                        Steven W. Wells, Esq., of counsel
                        John R. Weider, Esq., of counsel
                        Ingrid S. Palermo, Esq., of counsel
                        Joseph E. Simpson, Esq., of counsel
                        Twelve Fountain Plaza, Suite 400
                        Buffalo, New York 14202-2293
                        Attorneys for Debtor

                        Stephen A. Donato, Esq.
                        1 Lincoln Center 18th Floor
                        Syracuse, New York 13202
                        Attorneys for Continental Plants Group, LLC

                        Penney, Maier & Wallach
                        Mark S. Wallach, Esq., of counsel
                        169 Delaware Avenue
                        Buffalo, New York 14202
                        Attorneys for Chapter 7 Trustee of
                            William P. Brosnahan Jr.

                        Hodgson Russ LLP
                        Garry M. Graber, Esq., of counsel
                        One M&T Plaza, Suite 2000
                        Buffalo, New York 14203
                        Attorneys for Creditors Committee

                        Daniel H. Williams III
                        175 Middlesex Road
                        Buffalo, New York 14216
                        Attorney pro se

                        Christopher K. Reed, Assistant U.S. Trustee
                        Office of the U. S. Trustee
                        Mary Powers, Esq., of counsel
                        42 Delaware Avenue, Suite 100
                        Buffalo, New York 14202

This case provides an unusual opportunity to consider standards for the approval of first day motions in a case filed under chapter 11.

The Colad Group, Inc. ("Colad") is a specialty printer, whose primary business involves the production and sale of custom folders, binders and other stationary products.  On the evening of Thursday, February 3, 2005, Colad electronically filed a petition for relief under chapter 11 of the Bankruptcy Code. The following day, debtor's counsel contacted the court to schedule an opportunity on an emergency basis to seek the court's approval of "first day orders."  For this purpose, the court reserved time for both a conference and, if necessary, a hearing, on the afternoon of Tuesday, February 7.  In atten-dance at those proceedings were counsel  for the debtor; counsel from the Office of the United States Trustee; counsel for Continental Plants Group, LLC ("Continental"), the primary secured creditor in this case; and Daniel Williams, pro se.

Daniel Williams is the largest creditor in the chapter 7 bankruptcy case of William P. Brosnahan, Jr., an individual who at one time was affiliated with Colad.   In the present context, it is not necessary to relate the complex and contentious issues that the Brosnahan case has presented.  Rather, it suffices to note that Colad identifies the bankruptcy estate of Brosnahan as its largest unsecured creditor, and that Brosnahan's trustee has named Colad as a defendant in various adversary proceedings.   For these reasons, this court directed that the Brosnahan trustee and its largest creditor receive notice of the conference and hearing relative to any first day motions in the Colad case.   Mr.

05-10765B

Williams participated in those proceedings,[1] and his objections have served to focus the court's attention on a number of issues that have long had need for explication.

In bankruptcy practice, the phrase "first day motions" refers generally to any of a variety of requests made shortly after the filing of a chapter 11 petition, for prompt authorizations needed to facilitate the operation of the debtor's business. On February 7th, the debtor presented eight such motions, as follows:

1. a motion to authorize payment of pre-petition employee compensation and benefits;

2. a motion to authorize payment of pre-petition sales and use taxes;

3. a motion to specify adequate assurance of payment for post-petition utility services and to prohibit utilities from discontinuing, altering or refusing service;

4. a motion to authorize the debtor to implement a key employee retention and incentive program for non-insiders;

5. a motion to approve the employment of a restructuring consultant, whose services would include those of a chief restructuring officer;

6. a motion to approve the retention of bankruptcy counsel;

7. a motion to authorize the debtor to maintain an existing cash management system and bank accounts, and to authorize the clearing of checks in transit; and

---

[1]Over the debtor's objection, this court ruled that Mr. Williams had standing to appear as a party in interest. Even if Mr. Williams had not appeared, however, this court would have *sua sponte* raised the same issues discussed herein.

8.   an application for emergency and final authority to obtain post-petition financing to be secured by a priming lien with administrative super-priority.

As of the present moment, this court has already rendered an oral decision with respect to all aspects of the above motions, with the exception of the application for final authority to obtain post-petition financing.  Written orders have memorialized these oral decisions.  With respect to post-petition financing, the debtor presently operates with benefit of an interim financing order.  Primarily, the instant decision must address issues that relate to the terms of the final financing arrangement.  However, to place the outstanding issues into context and to clarify the appropriate standard for first day orders, the court wishes to identify relevant principles and briefly recite the rationale for its ruling as to each of the motions.

In attempting to justify the grant of many first day orders, debtors will urge reliance upon the so-called "Doctrine of Necessity."  Based historically upon provisions of the Railway Labor Act, 45 U.S.C. §151 *et seq.*, the Doctrine of Necessity finds support from section 105(a) of the Bankruptcy Code, which authorizes the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  2 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 105.04[5][a] (15 ed.rev. 2003). Nonetheless, section 105(a) does not create authority and rights that do not otherwise arise from the express provisions of the Bankruptcy Code.  In the Second Circuit, the Court of Appeals stated the controlling interpretation of section 105(a) in its decision in *F.D.I.C. v. Colonial Realty Co.*, 966 F.2d 57, 59 (1992): "By its very terms, Section 105(a) limits the bankruptcy court's equitable powers, which 'must and can only be exercised within the confines of the Bankruptcy Code[,]' and 'cannot be used in a manner inconsistent with the

commands of the Bankruptcy Code'" (citations deleted).  Within this spirit, this court has discerned four principles that should apply to consideration of first day motions.

First, the requested relief should be limited to that which is minimally necessary to maintain the existence of the debtor, until such time as the debtor can effect appropriate notice to creditors and parties in interest.   In particular, a first day order should avoid substantive rulings that irrevocably determine the rights of parties.

Second, first day orders must maintain a level of clarity and simplicity sufficient to allow reasonable confidence that an order will effect no unanticipated or untoward consequences.

Third, first day orders are not a device to change the procedural and substantive rights that the Bankruptcy Code and Rules have established.  In particular, first day orders should provide no substitute for the procedural and substantive protections of the plan confirmation process.

Fourth, no first day order should violate or disregard the substantive rights of parties, in ways not expressly authorized by the Bankruptcy Code.

Other principles may also apply with respect to certain first day motions, but the above list will help to explain the court's rulings with respect to the eight motions that the debtor presented in the instant case.

## Payments to Employees and to Taxing Authorities

The debtor's first motion sought authority to pay pre-petition wages and benefits; its second motion sought to approve payment of pre-petition use and sales taxes.  In papers filed with these motions, the debtor represented that nearly all of these wages, benefits and taxes would constitute priority claims;

that the debtor had incurred these obligations in its ordinary course of operations; that the outstanding wages and benefits were pre-petition obligations that were not yet payable; that a disruption of wage and benefit payments could affect its ability to maintain its work force; and that the outstanding tax liabilities were ordinary obligations for use taxes and for sales taxes that the debtor had collected from its customers. In considering these two motions, the court was principally concerned for prejudice to the rights of other creditors. As against the interests of general unsecured creditors, the tax claims and nearly all of the employee claims held priority. No other priority claims appeared to be outstanding. Secured creditors might typically hold a superior interest in the cash that would be paid to the employees and taxing authorities, but here, the secured creditor consented to the debtor's proposed distribution. Based upon that consent and upon the various representations made on behalf of the debtor, the court granted both motions in substantial part. With respect to employee wages and benefits, however, the distribution could not exceed the priority limits of 11 U.S.C. §507(a)(3) and (4), except for an amount that the court deemed to be *de minimis* and with restrictions on payments to an insider.

### Post-petition Utility Services

Without prior notice to utilities, the debtor also moved for an order specifying adequate assurance of payment for post-petition utility services and to prohibit utilities from discontinuing, altering or refusing service. Concerned that a lack of notice had denied due process to the affected utilities, this court refused to consider such an *ex parte* application. Moreover, the motion sought extraordinary relief with respect to issues that Congress had already addressed in section 366 of the Bankruptcy Code. Section 366 protects a debtor's access to utility service during the first twenty days after the filing of a bankruptcy

petition.  Then, on "request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of deposit or other security necessary to provide adequate assurance of payment."  11 U.S.C. §366(b).   By its first day motion, the debtor essentially sought to disregard the procedural requirements of section 366 for a notice and hearing. Nor was such special relief necessary, in light of the protection of utility access for twenty days. For these reasons, the court denied the debtor's motion, but without prejudice to a future application under section 366.

### Key Employee Retention and Incentive Program

The debtor next moved for authority to implement a key employee retention and incentive program for non-insider personnel.  Specifically, the debtor proposed to offer a bonus to key employees who would remain with the company through the completion of the anticipated sale of the debtor's operating assets.  Contemplating a typical bonus equal to 133 percent of an individual's bi-weekly pay, the debtor estimated a total cost to the estate of less than $25,000.    In support of its request, the debtor represented that it required the services of these key employees; that the debtor had no ability on the short term to replace these key employees; and that in light of the debtor's precarious financial condition, these employees might accept other employment unless they received sufficient financial incentive to remain with the company.

The retention and incentive program represents the type of operational decision for which this court will generally give reasonable deference to the sound discretion of management.  In the present instance, to the satisfaction of this court, the debtor has demonstrated an immediate danger to its personnel requirements and hence, that it has an urgent need for the proposed program.  The projected payments appear to be reasonable in amount.   The court discerns nothing in the program that would violate any substantive rights

of parties in interest. For these reasons, the court granted this first day motion to authorize a key employee retention and incentive program.

### Restructuring Consultant

Pursuant to 11 U.S.C. §363(b), Colad asked the court to approve the continued employment of Getzler Henrich & Associates LLC ("Getzler Henrich") as a restructuring consultant.  As part of this engagement, Getzler Henrich will also provide the services of a chief restructuring officer.  In its moving papers, the debtor acknowledged that prior to the bankruptcy filing, its secured creditor had requested that Colad retain the services of a restructuring firm.  Colad's president further represented that the debtor needed these consulting services "in order to maximize recovery for all parties in interest."

This court realizes that the designation of a particular restructuring manager may define the likely course of events in a bankruptcy proceeding. What inferences may be drawn from the fact that the debtor selected the proposed consultant upon the recommendation of the secured creditor?  Do past practices reveal a history of recommendations which may have been made in good faith, but which nonetheless follow a pattern that Continental may now prefer?  These questions suggest that even though the Debtor and Getzler Henrich signed a management agreement prior to the bankruptcy filing, the continued retention of the firm will involve the use of resources outside the ordinary course of the debtor's business.  Accordingly, the debtor has properly moved for court approval of Getzler Henrich's appointment.

Section 363(b) provides that a debtor in possession "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  By reason of the requirement for notice, this court denied the first day motion for final approval of the retention of Getzler

Henrich.  Instead, the court approved an interim retention, with direction for
final hearing on notice to the twenty largest creditors and others who might
request service.  At that final hearing, debtor's counsel demonstrated the need
for a consultant and that Colad had exercised sound discretion in its selection
of Getzler Henrich.  For these reasons, the court then gave its final approval to
the retention proposal.

### Retention of Counsel

In the absence of opposition from the office of the United States Trustee,
this court will normally grant a first day motion for the appointment of counsel
for the debtor in possession.  In the present instance, however, the proposed
firm had previously represented William J. Brosnahan, as well as  two of the
debtor's creditors on unrelated matters.  Section 327(c) of the Bankruptcy Code
provides that such prior representation does not preclude employment by the
debtor, "unless there is objection by another creditor or the United States
trustee, in which case the court shall disapprove such employment if there is
an actual conflict of interest."  To allow creditors to assert any such opposition,
this court requires that creditors receive appropriate notice of the proposed and
prior representations.   Accordingly, as a first day order, I approved only an
interim appointment of counsel.[2]

### Cash Management System

Prior to its bankruptcy filing, Colad had established a cash management
system, which required the deposit of receipts into a lockbox and the transfer

---

[2]Thereafter, at the hearing on notice, Daniel Williams argued that an actual conflict arose from
counsel's prior representation of Brosnahan.  Wishing to monitor for the possibility of a conflict, the
court then approved only a temporary appointment of counsel, and adjourned the motion for further
consideration at a future date.

of those funds to Continental, on account of its secured position.  Essentially, this system facilitated the debtor's revolving credit agreement, under which Colad would direct all receipts toward payment on account of its secured obligations and Continental would continuously advance new funds into Colad's operating accounts.  If continued on a post-petition basis, this arrangement would cause the gradual but inevitable satisfaction of the debtor's pre-petition obligation and a corresponding re-extension of credit with administrative priority.  Later in this opinion, I will consider the debtor's motion to approve post-petition financing.  In a separate first day motion, the debtor sought authority to maintain its cash management system.

Colad represented to the court that the Office of the United States Trustee was insisting that the debtor close all existing bank accounts; that it open new accounts in the name of the debtor in possession; that it maintain a separate account for cash collateral; and that all checks bear the description "debtor in possession", as well as the bankruptcy case number and a designation of the purpose of the account.  Arguing that these measures would unduly disrupt its operations, Colad sought a first day order that would allow it to maintain its pre-petition system of cash management.  Further, Colad represented that at least some payroll checks were still in float.  In light of the first day order allowing payment of priority wage claims, a closing of the existing payroll account would cause the dishonor of existing checks and would thereby impact adversely upon the debtor's relationship with its employees.  To the extent that other outstanding checks would also clear, Colad proposed to preserve any right to retrieve an unauthorized payment pursuant to 11 U.S.C. §549.

In comparison to the debtor in possession financing agreement, the cash management system has only tangential significance to the administration of this case. For reasons of convenience, I granted the debtor's request to maintain all of its existing accounts, but on condition that the debtor order new checks indicating Colad's status as a debtor in possession. Additionally, I allowed the processing of extant checks, in order to avoid disruption of relationships with employees who in any event would have claimed priority for the amount of their uncashed checks.

## Debtor in Possession Financing Agreement

The most important of the first day motions was the application for authority to obtain post-petition financing. Like most debtors in chapter 11, Colad had pledged nearly all of its assets as collateral to secure a pre-petition credit facility. Among these assets were Colad's inventory, receivables, and the proceeds of its inventory and receivables, all of which are deemed to constitute "cash collateral," as defined by section 363(a) of the Bankruptcy Code. Pursuant to 11 U.S.C. §363(c)(2), a debtor in possession may not use cash collateral unless either "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." Hence, without either consent or court authorization, Colad would have had no access to most of the cash that would have been generated through its normal business operations. To satisfy its cash needs, Colad moved under 11 U.S.C. §364 for emergency and final authority to obtain post-petition financing from Continental, the current holder of Colad's pre-petition loan facility.

Continental and Colad have proposed to link the post-petition financing facility to the debtor's pre-petition revolver loan. Under their agreement, proceeds of collateral would be applied first to the satisfaction of the balance due on the pre-petition loan. Meanwhile, Continental would fund the debtor's post-petition activities through new advances under the post-petition facility. Providing that post-petition advances would be secured by all assets of the debtor, the proposed facility would also create an obligation that would receive administrative and super priority status, as allowed under 11 U.S.C. §364(c).

In a competitive and adversarial environment, one cannot fault a creditor for seeking an outcome that will maximize the return for itself. For this reason, this court has often approved the post-petition use of a revolving credit facility. From the lender's perspective, such an arrangement avoids the various legal problems of cross-collateralization. In a cross-collateralization arrangement, a lender advances new credit on condition that an enhanced set of collateral will secure both pre-petition and post-petition loans. Instead, the revolver arrangement permits a satisfaction of the pre-petition loan, so that an increasing percentage of the lender's total exposure will receive the security and benefits of the new post-petition credit facility. Although this court will approve a proper-post petition revolver facility, it will not allow a disregard of the procedural and substantive rights of other parties in interest.

Bankruptcy Rule 4001 imposes procedural rules for consideration of a motion for authority to obtain credit. Subdivision (c)(1) of this rule requires that the court treat such a motion as a contested matter under Rule 9014, and that notice of such a motion be served upon the members of the Official

Committee of Unsecured Creditors, or if no committee has been appointed, then upon the twenty largest unsecured creditors. In a typical case, this requirement of notice presents practical challenges, in as much as most debtors have an immediate need for financing. For this reason, the following text of Bankruptcy Rule 4001(c)(2) attempts to find a balance that will accommodate both financial necessity and concerns for due process:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, *but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.*

(emphasis added). Pursuant to this rule, therefore, the court may consider a first day motion to approve an emergency lending facility, but only if two conditions are satisfied. First, any emergency authorization must be limited only "to the extent necessary to avoid immediate and irreparable harm." Second, the authorization may be effective only until a final hearing on appropriate notice to creditors as required under Rule 4001(c)(1).

In support of its first day motion for authority to obtain post-petition financing, the debtor represented that it could not operate without a post-petition line of credit and that it had no ability to obtain such credit from any source other than Continental. Conceptually, this Court found that these representations were adequate to justify an appropriate form of emergency lending until the scheduled hearing for final approval. However, in the form that the debtor proposed, the emergency funding order was unacceptable for the following four reasons:

1.  The order failed to reflect any effort to limit the conditions of credit only to those which would be absolutely necessary to avoid immediate and irreparable harm.  *See* Bankruptcy Rule 4001(c)(2).  Rather, the proposed order would have approved an interim loan agreement with terms essentially identical to those contemplated for the final loan agreement.  The only difference between the two agreements was their effective date.  Without a showing of any compelling reason for identical terms, the debtor appeared to treat the interim order as a mere formality of procedure on a one-way street to approval of a final order.

2.  The interim order was inappropriately complex, and thereby denied to the court a sufficient basis of confidence in the reasonableness of its terms.  On an emergency basis, the debtor wanted the court to sign a twenty-six page order, which incorporated the terms of a loan agreement that filled 93 pages of single space text, including exhibits.  This court appreciates the dollar value of the proposed lending facility, and accepts the need for a comprehensive agreement.  For this reason, as hereafter discussed, the court has carefully examined the terms of the final loan agreement.  A first day order is inherently different, however.  Without benefit of opportunities for comment from creditors on notice, the court must view with skepticism the exigent submission of any such complex instrument.

3.  Based on its cursory review, the court discovered that the proposed order would change substantive and procedural rights, without allowing any reasonable opportunity for creditor objection.  For example, the interim loan arrangement included a grant of relief from the automatic stay in

the event of default, limitations on the debtor's right to propose a plan of reorganization, and a waiver of various claims that the debtor might assert against Continental.  Particularly troublesome were the provisions of section 11.6 of the Loan Agreement, which purported to require, as a condition for interim funding, the disavowal and waiver of various "rights and remedies provided under the Bankruptcy Code, the Federal Rules of Civil Procedure, and the Bankruptcy Rules."  Furthermore, paragraphs 2.1 and 11.1 of the Loan Agreement seemingly attempted to grant administrative priority to the pre-petition claims of Continental.  Later in this opinion, the court will discuss whether certain of these terms are appropriately included into an order that authorizes lending on a final basis.  As part of a first day order, where unsecured creditors have had no opportunity to object, such terms are unacceptable.

4.  As originally submitted, the first day lending order proposed to authorize a potential violation of state law and to waive the substantive rights of other creditors without prior notice to them.  By its terms, the proposed loan agreement contemplated a post-petition advance of $500,000, for a term of approximately 90 day.  In addition to interest at the rate of 4.5 percent over prime, Colad was to pay loan fees totaling in excess of $135,000.  Based upon these facts, the court questioned whether the cost of borrowing would exceed New York State's criminal usury rate of 25 percent.  Additionally, the debtor's proposed order would approve a loan that was conditioned upon a waiver of all marshaling obligations.  Without deciding these issues, this court refused on an emergency basis to approve the loan charges or to consider a waiver of rights, where the affected creditors had yet to receive notice of the debtor's proposal.

At the hearing to consider the debtor's first day motions, the respective attorneys for Colad and Continental responded to the above concerns, by asserting that the proposed lending arrangement represented the best and only terms available to the debtor.  In my view, this position seemed disingenuous. Continental had recently acquired its secured position, with the stated desire to effect a purchase of assets as a going concern under section 363 of the Bankruptcy Code.   With this objective, Continental would be obviously disinclined to compel a distressed liquidation of its position.  As holder of a first lien in the debtor's inventory and receivables, Continental was positioned to dictate terms.   Consequently, the proposed loan did not represent terms negotiated in any form of open market.  Although the reality of circumstances might compel acceptance of these terms after a final hearing, this court was unwilling to disregard the above mentioned concerns until at least after the twenty largest unsecured creditors had opportunity to object.

The resolution of the motion for interim financing confirmed the court's perception of disingenuousness with regard to the assertion that the debtor could obtain no better terms of lending.  After this court refused to approve an order in the form that the debtor had first presented, the parties negotiated an arrangement that the court could accept on an interim basis.  Ultimately, I signed a simpler order authorizing the debtor to borrow funds needed to pay necessary expenditures.  With respect to these advances, the lender received a super-priority administrative expense claim secured by a lien on all of the debtor's assets.  Without rejecting the possibility of eventual approval under the terms of a final lending order, the interim order deferred consideration of the various provisions which the court had found to be troublesome.  In

particular, the parties agreed that most of the proposed loan fees would be charged not in connection with the interim loan, but only if authorized under the terms of a final loan agreement.

The interim lending order authorized the debtor to borrow funds on an emergency basis, until such time as the court would decide the request to approve a final lending order.  As required by Bankruptcy Rule 4001(c), the court also directed that the debtor give to the twenty largest creditors a fifteen day notice of the hearing to consider a final DIP lending facility.  That hearing was initially scheduled for February 24, but on consent of all parties, was adjourned to March 8.  A further hearing with respect to the terms of a possible order was then conducted on March 28, 2005.

## Motion to Authorize a Final DIP Lending Facility

The debtor seeks authority to borrow funds under the terms of a final lending facility, whose present form incorporates changes designed to address some of the concerns that the court expressed to the parties at the hearing to approve interim lending.  Appointed subsequent to the consideration of interim authorization, the Official Committee of Unsecured Creditors now supports the debtor's motion for final authority.  However, Daniel Williams opposes the request.  Primarily, he contends that the proposed facility entails excessive risk, particularly in light of the fact that the debtor's financial history indicates the improbability of a successful reorganization.  The court might give greater consideration to this objection, if the debtor intended to reorganize as a going concern.  In the present instance, however, the debtor has candidly indicated an intent to liquidate, most likely through a sale of assets under 11 U.S.C. §363.  Thus, the borrowing is designed only to maintain operations as a going concern for the short term, until a sale can be completed.  Under these

circumstances, the court is prepared to authorized borrowing under terms of an appropriate facility. However, the court cannot approve lending in the form that Colad and Continental have proposed.

In addition to his general opposition, Daniel Williams presented 27 objections to specific terms of the debtor's lending proposal. Except as stated herein, these objections are overruled. Due to the need for a timely decision, the court will not now comment about those provisions of the lending agreement that are acceptable. Rather, this opinion will discuss five fatal defects that preclude approval of the proposed order in its current form.

**1. The proposed order would sanction excessive and usurious interest.**

The debtor seeks to borrow a maximum of $494,000.00 for a term of less than ninety days. On this loan, the debtor would pay interest at an annual rate of four and one-half percent over "the Chase Bank Rate." In addition, however, the debtor would pay a non-refundable loan commitment fee of $50,000, a closing fee of $50,000, collateral management fees of $10,000 at closing and $1,500 per month thereafter, and an unused line fee based on a formula that would be calculated each month. All of these various fees would be deducted from the amount that the debtor proposes to borrow. Thus, the debtor would actually receive operating funds of less than $381,000 dollars. Because the term of the loan is less than ninety days, the fees alone would represent charges equivalent to an interest rate in excess of 100 percent per annum.

New York law exempts corporate borrowings from the penalties of civil usury. N.Y. Gen. Oblig. L. §5-521(1). However, pursuant to General Obligations Law §5-521(3), this exemption does not extend to the prohibitions against criminal usury in Penal Law §190.40. This latter section provides generally that

a person or entity commits criminal usury in the second degree when it "knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period."

Paragraph 10.6 of the proposed loan agreement would obligate Colad to pay "all out-of-pocket costs and expenses" that Continental may incur. Consequently, the various loan fees do not represent any reimbursement of reasonable costs and expenses. With no evidence of a contrary purpose or effect, the court can only view the fees as the collection of additional interest. *See* N.Y. Gen. Oblig. L. §5-501(2). Unless some other statutory exception applies, therefore, the proposed loan agreement would violate the criminal usury provisions of New York law.

Subdivision (6)(b) of New York General Obligations Law §5-501 states that the criminal usury statute shall not apply to any loan or forbearance in the amount of $2,500,000 or more. In its application for interim borrowing authority, Colad asked the court to approve an agreement that would allow a loan amount for "up to the maximum of $494,000." Now, in the application for final borrowing authority, Colad seeks to approve a restructured loan agreement. Although the restructured agreement also seeks a similar advance of new credit, it defines the "Post-Petition Loan Amount" as "up to the aggregate of $3,252,000.00, consisting of (a) the renewal of the pre-petition revolving line of credit and (b) the over-line facility in the amount of $494,000.00 . . . ." The issue for this court is whether such wordsmithery and linguistic legerdemain can transform the proposed post-petition loan into a transaction that is exempt from New York's usury prohibition.

This court believes that it must treat the post-petition advances as a separate loan that is subject to the prohibitions against criminal usury. Section 364 speaks only to court approval of post-petition indebtedness, and not to any ratification of pre-petition obligations. If Continental and Colad had so wanted, they could have proposed a new loan whose proceeds would be used to discharge the pre-petition loan and to fund post-petition activity. For good reason, however, the parties chose to preserve the pre-petition indebtedness. As against other secured debt, the pre-petition loans retain priority that relates to the earlier date of perfection. Accordingly, section 11.2 of the proposed loan agreement states that notwithstanding any other provision of that contract, "the pre-petition liens of the Pre-Petition Lender on the Pre-Petition Collateral will remain in full force and effect." Preservation of the pre-petition debt also serves to avoid the risk of a loss of priority, in the event of a demonstration of bad faith after a reversal on appeal of any lending authorization. *See* 11 U.S.C. §364(e). Ultimately, the loan restructuring serves only to highlight the transparency of Continental's purpose and intent. Despite its reference to the pre-petition obligation, the modified loan agreement created a new loan of only $494,000. Section 2.1 of the post-petition loan agreement confirms that the new loan arises not as a continuing advance under the prior agreement, but pursuant only "to the terms of the Pre-Petition Loan Agreement," and then "*as amended and supplemented hereby and by the Bankruptcy Court Order.*" (emphasis added). This is not an instance in which the debtor seeks to assume a pre-petition agreement which, but for bankruptcy, would have authorized the desired advance of funds. Instead, the post-petition loan represents a new lending facility. Being less than $2,500,000, this new loan falls below any exemption to the applicable law of criminal usury.

At the hearing on the motion for final lending authorization, the debtor presented testimony showing that it was unable to obtain credit on any terms other than as proposed.  While such proof may satisfy some of the requirements for the approval of secured and priority credit under 11 U.S.C. §364, the testimony provides no justification for a waiver of defenses under 11 U.S.C. §558.  In relevant part, this section states that the bankruptcy estate "shall have the benefit of any defense available to the debtor as against any entity other than the estate, including . . . usury."  Moreover, pursuant to that section, "[a] waiver of any such defense by the debtor after the commencement of the case does not bind the estate."

The civil implications of criminal usury are unsettled under New York law. *In re Venture Mortgage Fund, L.P.*, 282 F.3d 185 (2nd Cir. 2002).  When a lender other than a bank charges a rate of interest in excess of the civil usury limits, General Obligations Law §5-511 will void the underlying obligation. Here, the proposed loan satisfies civil limitations but would violate criminal prohibitions.  Under these circumstances, the statute does not indicate whether the criminal usury violation would similarly void the entire obligation. Nonetheless, the borrower would presumably enjoy at least a defense against collection of excessive interest.  Pursuant to 11 U.S.C. §558, this court is obliged to honor such a defense.

This court does not mean to suggest that in extending the proposed credit with court authorization, Continental would have met the scienter requirement of the Penal Law.  Under no circumstance, however, will this court authorize acts that would otherwise be criminal under New York law.  The bankruptcy process provides no safe haven for criminal activity.  In New York, the criminal usury law has as its very purpose the imposition of an absolute cap on interest.

For whatever reason, the New York legislature has decided that an interest limit of 25 percent per annum will apply to transactions of less than $2,500,000, even when the statute will cause a denial of all credit. Because the proposed loan would violate criminal usury if extended outside bankruptcy, this court will not now authorize its proposed terms.

This court must also reject the proposed loan fees for a second independent reason. Even if the proposed transaction could overcome a usury defense, the fees serve as an inappropriate subterfuge to avoid the requirement for a commercially reasonable disposition of assets under U.C.C. §9-610.

By its terms, the revised loan agreement contemplates a sale of the debtor's assets to Continental. Having recently acquired its secured position by assignment from the prior lender, Continental will make a credit bid for those assets. If it had elected to exercise the rights of a secured creditor under article 9 of the Uniform Commercial Code, Continental would have been required to fulfill the mandate of section 9-610(b). 4 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 34-11 (5th ed. 2002). In relevant part, this section provides that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." Outside bankruptcy, the amount of Continental's credit bid would include only the balance due on its outstanding loan facilities, including any costs recoverable under the loan agreement. Now, Continental proposes to enhance the amount of that credit bid with loan fees totaling at least $113,000.00. Such an enhancement can only work to chill the prospects for competitive bidding. Any such chilling effect will jeopardize the possibility of a surplus that might inure to the benefit of unsecured creditors.

Interest and loan fees in any amount will necessarily reduce the surplus from the sale of secured assets. If proposed in isolation from the contemplated sale of assets, the loan might not be subject to the same criticism. But Continental acquired its current position in contemplation of an asset purchase. Now Continental proposes loan fees that can only serve to facilitate its desired acquisition, all to the possible detriment of any competing bid. These fees represent no "out of pocket" cost to the lender. In my view, such machinations would be commercially unreasonable outside bankruptcy. Investors may not use the bankruptcy process to obtain respectability for otherwise suspect efforts to influence a bidding process. Accordingly, the court will not approve the proposed loan fees in the present instance.

## 2.  The debtor offers insufficient justification for a priming lien.

The debtor seeks an order which would give to Continental a priming lien over all other secured creditors. In my view, however, the present circum-stances do not justify such relief under the applicable standard of 11 U.S.C. §364(d)(1):

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if – (A) the trustee is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

In the present instance, Continental seeks the benefit of a generalized priming as against the positions of all other secured creditors. However, the moving papers fail to identify any secured creditors whose liens would be primed. Under these circumstances, a priming lien of any kind would be inappropriate for two reasons. First, the notice requirement of section 364(d)(1) must necessarily inure to the benefit of superior lienors. Without an identification of those

superior lienors, the court cannot possibly confirm the adequacy of notice. The debtor has satisfied the requirements of Bankruptcy Rule 4001, which mandates notice either to the twenty largest unsecured creditors or to a committee appointed under 11 U.S.C. §1102. This notice, however, does not necessarily reach the holders of secured debt. Seeking to modify the rights of parties *in absentia*, the generalized priming lien cannot possibly satisfy the notice requirements of section 364(d)(1). Second, as required by section 364(d)(1)(B), in order to grant a priming lien, the court must make a finding of adequate protection of all senior or equal interests. With no identification of those interests, the court cannot begin to assess the adequacy of protection. Contrary to the mandate of 11 U.S.C. §364(d)(2), therefore, the debtor has failed to meet its burden of proof on this issue.

### 3. The debtor proposes an impermissible modification of the rights of third parties.

Any extension of secured credit will usually impact the interests of other creditors. In bankruptcy, the court may authorize the debtor to exacerbate this impact in several narrowly defined ways. For example, under section 364(c) of the Bankruptcy Code, the court may grant priority over other administrative creditors. As noted earlier in this opinion, section 364(d) permits a priming lien in certain limited circumstances. Generally, however, the Bankruptcy Code gives to post-petition secured creditors only the same rights that a secured creditor could acquire outside bankruptcy. Unless the Bankruptcy Code expressly provides, this court has no power to diminish the rights of third parties as against a secured creditor.

Colad has asked the court to approve an order which provides that Continental "will not be subject to the equitable doctrine of 'marshaling' or any other similar doctrine with respect to any of the Collateral." Conversely, section

11.7 of the proposed loan agreement would preserve Continental's right to seek the equitable remedy of marshaling for its own benefit. These contrasting provisions obviously violate the maxim, that one who seeks equity must do equity. *In re United States Lines, Inc. (Asbestosis Claimants v. U. S. Lines Reorganization Trust)* 318 F.3d 432, 437 (2nd Cir. 2003). But more fundamentally, equitable principles like marshaling have potential application to every secured indebtedness. While the debtor may seek authority to waive its own rights, it cannot waive the marshaling rights of parties who have not consented and may not even have received notice of the debtor's motion. Under the present procedural circumstances, this court can discern no basis to eviscerate the equitable doctrine of marshaling.

### 4. The debtor proposes an inappropriate modification of statutory rights and obligations in bankruptcy.

The debtor and its secured creditor do not constitute a legislature. Thus, they have no right to implement a private agreement that effectively changes the bankruptcy law with regard to the statutory rights of third parties. In three important respects, Colad and Continental have proposed terms that would impermissibly modify the laws and rules of bankruptcy.

First, the proposed order would prohibit any surcharge of collateral under section 506(c) of the Bankruptcy Code. This section provides that a trustee "may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." For example, if a sprinkler system extinguishes a fire that would otherwise have destroyed Continental's collateral, section 506(c) would allow the trustee to recover the resulting water bill. Instead, Colad and Continental would either deny the means to pay such charges, or would impose such costs on funds available for

distribution to unsecured creditors.  By its language, section 506(c) speaks only to the payment of reasonable and necessary costs.  This court can discern no basis to allow a secured creditor to ignore its application.

Second, to the detriment of any future trustee, the proposed order would change the procedural requirements for stay relief.  Section 362(d) of the Bankruptcy Code provides that the court may grant relief from the automatic stay "[o]n request of a party in interest and after notice and a hearing." Instead, the proposed order would create a default procedure, whereby the stay would automatically lift upon a failure by any interested party to demand a hearing within five business days following notice of an event of default.  To the extent that the debtor and creditors' committee consent, this court would approve such a procedure for purposes of notice to the consenting parties. However, the court will not sanction a waiver of the controlling standard for a hearing on notice to any trustee that may hereafter be appointed.

Third, the proposed order would repudiate the provisions of 11 U.S.C. §546(a), which sets time limitations for commencement of an action to enforce the avoiding powers of sections 544, 545, 547, 548, and 553 of the Bankruptcy Code.  Pursuant to section 546(a), unless a case is sooner closed or dismissed, the trustee may commence any avoidance action within the latter of 2 years after the entry of an order for relief, or one year after the appointment or election of a first trustee within the period of two years after entry of an order for relief.  Instead, paragraph 26 of the proposed order would more severely limit the commencement of an avoidance action.    For example, it would provide that upon conversion of the case to chapter 7, the trustee would be compelled to commence any avoidance action within the earlier of sixty days after appointment or thirty days after delivery of various documentation.

Bankruptcy Rule 9006 allows an enlargement or reduction of many of the time limits in the Bankruptcy Rules. However, section 546(a) is a statute, not a rule. Consequently, this court lacks authority to approve the shorter time limits that Continental would impose.

**5.  The proposed order includes a finding of good faith that the parties have yet to establish on the record.**

Section 364(e) of the Bankruptcy Code provides generally that a reversal or modification on appeal of an order authorizing secured debt "does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith . . . ." For this obvious reason, the debtor has proposed an order which includes a finding that Continental is extending credit in good faith. At the hearing on this motion, the debtor offered only one witness and his statements about good faith were conclusory. Moreover, the order's other defects cause uncertainty about intent, particularly with respect to any attempt to discourage competitive bidding. Any finding of good faith is more appropriately made with the benefit of testimony and argument after a reversal or modification on appeal. This is not to say that the debtor would not be able to establish good faith at a future hearing. At this time, however, the court simply lacks an adequate basis to reach any conclusion about Continental's good faith.

## Conclusion

For the reasons stated above, this court will not approve the form of the debtor's proposed order. Nonetheless, the court would sign an appropriate order authorizing a post-petition loan that avoids the various defects identified

herein.  With hope that the parties will negotiate the necessary changes, I will continue the interim financing authorization until further order of the court.

      So ordered.

Dated:      Buffalo, New York              /s/ CARL L. BUCKI
             April 27, 2005                  U.S.B.J.